( Decided June 2nd, 1858.)

---

# WILLIAM FERGUSSON and others, *vs.* WILLIAM T. BRENT.

In an action against a *common carrier*, it was proved that while the vessel was on her way down the Patapsco, a *heavy fog* arose, which induced the captain to make for North creek harbor, where there were many vessels safely moored at the time, and in approaching it he was at the helm with a lookout, who, as the vessel neared the entrance, notified him *there was a buoy*, whereupon he bore away, and the vessel struck *upon a rock*, about thirty yards from the *buoy*, and sunk, thereby damaging the plaintiff's goods. There was no *bill of lading*, and it was also proved that at low water a person standing on the vessel could see *the rock* under the water, which *rippled over it*. HELD:

That this was not an *act of God*, exonerating the carrier; the fact that a *buoy* was placed to indicate the dangerous spot, sufficiently shows that the existence of the rock was *generally known*, and it was the duty of the master to have known and avoided it.

*Private* carriers will be discharged by proof of loss by *inevitable accident*, but nothing will relieve the *common* carrier save an act of God or the public

2      v. 12.

enemies, or that which arises from some event expressly provided for in the charter-party.

By an "act of God" is meant a natural necessity, which could not have been *occasioned* by the intervention of man, but which proceeds from physical causes alone, such as the violence of the winds or seas, lightning or other natural accident.

To relieve the carrier, the act of God must be the *direct* and *immediate* cause of the loss, and without which it would not have occurred; all circumstances produced by human agency must be excluded, so that if divers causes concur in the loss, the act of God being one, but not the *proximate* cause, it does not discharge the carrier.

The phrase, "perils of the sea," includes *something more* than is meant by "the act of God," such, for instance, as hidden obstructions in a river, newly placed there, and of a character that no human skill or foresight could have discovered and avoided.

APPEAL from the Circuit Court for Charles county.

This was an action *on the case* brought by the appellee on the 3rd of May 1855, against the appellants, to recover damages for injury to certain goods which the plaintiff placed on board the defendants' vessel, the *schooner Isabel,* to be transported from Baltimore to Port Tobacco, in Charles county. The declaration charges that the defendants were *common carriers,* and undertook to transport and deliver the goods safely and securely. The defendants pleaded *non assumpsit,* upon which issue was joined.

*1st Exception.* The plaintiff proved that the defendants were common carriers and joint owners of the Isabel, and that, on the 28th of March 1854, he shipped on board the same, at Baltimore, sundry goods, in good order, to be carried for freight from Baltimore to Port Tobacco, and there delivered to the plaintiff in like good order, and that the goods were not so delivered, but some four or five weeks afterwards were delivered to the agents of the plaintiff at Baltimore, and that they were damaged, while on board the vessel, to the extent of $425.88.

The defendants then proved by *Button,* who was on board the schooner, that she left Baltimore on the 28th of March 1854, between 10 and 11 o'clock, A. M.; that it had been raining in the morning, but was clear when they started; that

Fergusson, *et al.*, *vs.* Brent.

after proceeding on their way, below the fort, a dense fog arose, between 1 and 2 o'clock, P. M., and the captain then made for North Point creek, and in entering this creek the captain was at the helm, with one of the hands as a look-out, and one sounding by throwing the lead; that in entering the mouth of the creek, the look-out called to the captain that there was a buoy ahead, and to keep off; the course the vessel was then standing would have carried her over the buoy; that the captain immediately altered the course of the vessel, and about thirty yards from the buoy, struck on a rock and sunk. They further proved by *Lacey*, a hand on board the vessel, that it had been raining the morning she left Baltimore, but when they left it was fair, and there was nothing in the signs of the weather which would have prevented their leaving harbor; that there was a light breeze from north-north-east, which was a fair wind down the Patapsco, and the tide was ebb; that after they had proceeded on their voyage as far as Fort Carroll, it became calm, and a dense fog arose, between 1 and 3 o'clock, P. M.; that after a while a light breeze again sprung up, and the captain made for North creek harbor, the fog still continuing; that this harbor was on the route they were going, and the nearest harbor witness knew on said route, and that the wind was fair thereto; that in entering this harbor, about 4 o'clock, P. M., the captain was at the helm, and a look-out kept, and soundings made; that the look-out called out that there was a buoy ahead, and told the captain to keep off, which he did, and about thirty yards from and outside the buoy, the vessel struck on a rock and sunk; that this was a usual harbor for vessels to make when it was dangerous to remain out in the Patapsco, and that witness was not aware and never had heard of the existence of the rock; that a large number of vessels were in this creek for harbor at that time. Upon *cross-examination*, this witness stated that it was dark and raining and cloudy all the morning; that the Isabel started out with all sail spread, except the topsail and staysail, and that she went down through the fog without taking any of her sail in; that the rock upon which she was wrecked is at the mouth of North Point creek; that he does

not know whether this creek has any channel or not, that its mouth is a mile and a half wide, and that in low water, standing upon the vessel, he could see the rock under the water, which rippled over it. The defendants further proved by Captain *Neale*, that he commanded a vessel which navigated the Patapsco about twenty-five years ago, and that he would consider North creek harbor a proper and usual harbor for a vessel to make which was caught in a fog below Fort Carroll, and that he did not know of the existence of any rock in the mouth of said creek. Upon *cross-examination,* witness stated that he did not know of such places as Hawkins' point or Curtis' creek, on the Patapsco; that he only navigated this river for two or three years, and did not remember much about it.

The plaintiff then proved by *R. H. Mitchell,* that the day the Isabel left Baltimore, it was foggy and raining all day, the fog was very thick between 3 and 4 o'clock, and it was foggy in the morning, and that he has seen vessels and steamboats pass over the flats on the side of Fort Carroll, where the flats lie. By *Captain Wm. A. Allston,* who was in the habit of navigating the Patapsco, that on the morning of the day the Isabel sailed, there was rain, but not much fog; it was a misting rain, such as usually precedes a fog; witness was in the Patuxent river at the time, about eighty miles from Baltimore, in command of his vessel, and about 9 or 10 o'clock in the morning, put into harbor, judging it would be bad weather, and not thinking it proper to venture upon the bay; that North Point creek is five or six miles from Fort Carroll, which fort is five or six miles from Baltimore; that Curtis' creek is about two or three miles above Fort Carroll, and from the fort to Curtis' creek, a north-east wind is a directly fair wind. By *Vivian Brent,* that on the day the Isabel left, it was misty and foggy all day, and that he noticed the character of the weather in going to his office, about 9 or 10 o'clock in the morning, and particularly in going from his office to dinner, about 2 or 3 o'clock; that he remembers the day from hearing a few days after of the wreck of the Isabel, when he remarked at the time, that the captain should not have sailed on such a

day; that he has seen large Boston schooners sailing on the side of Fort Carroll, upon which the flats are; that Curtis' creek is about two or three miles from Fort Carroll, and a good harbor between Fort Carroll and Baltimore; that there is a cove directly opposite the fort, into which schooners sometimes put, and he has seen small vessels lying there, and that a north-east wind is equally favorable in going up or down the Patapsco.

Upon all the evidence the defendants asked the court to instruct the jury, that if they find from the evidence that the goods of the plaintiff were placed by him on board the Isabel, as a common carrier, and were either lost or damaged while on board, the plaintiff is entitled to recover to the extent of the damages he proves he sustained, unless they find from the evidence that the accident by which the damage occurred was inevitable, happened without fault on the part of the carrier, and which no human prudence could have enabled him to avoid. This instruction the court (ROBERT FORD, Special Judge,) refused to give, and to this ruling the defendants excepted.

*2nd Exception.* Upon all the testimony the court instructed the jury, that if they believe from the evidence that the defendants are joint owners of a schooner and common carriers between Baltimore city and Charles county, and that the plaintiff shipped by the schooner of the defendants any goods and merchandise, in the port of Baltimore, to be transported to Charles county, and if the jury shall further find that such goods or merchandise, so shipped as aforesaid, (if they shall find the goods or merchandise were so shipped,) were, in the course of their transportation from Baltimore to Charles county, injured or damaged, the plaintiff is entitled to recover whatever the jury shall find, from the evidence, to be the extent of the damage so sustained, unless the jury shall further find that the loss or damage resulted from the direct and immediate act of God, without the intervention of any human agency. To this ruling the defendants excepted.

*3rd Exception.* The defendants, upon all the testimony, asked the court to instruct the jury that if they find, from the

evidence, that the captain of the Isabel left Baltimore when there was nothing in the signs of the weather to threaten an interruption of his voyage, and that after proceeding upon his voyage below Fort Carroll, a dense fog suddenly sprung up, rendering it dangerous to proceed on his direct voyage, and that the harbor of North Point creek was a harbor deemed safe, and usually resorted to in such cases, and under the circumstances of his position, the harbor most convenient to be resorted to, and that in attempting to enter said harbor, the vessel struck upon a sunken rock, unknown to the captain and to pilots or persons carrying on navigation upon the river Patapsco, and that the damages to such goods resulted from striking on said rock, and that in entering or attempting to enter said creek, the captain used every precaution available to him to harbor his vessel safely, then the plaintiff is not entitled to recover. This instruction the court refused to grant, and to this ruling the defendants excepted, and the verdict and judgment being against them, appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and BARTOL, J.

*Frank H. Stockett* for the appellants, argued:

1st. That the court below erred in refusing the instruction contained in the first exception. It is submitted that the evidence, as set out in this exception, shows conclusively that the loss was occasioned by running on a sunken rock, not known to the master, or to those generally navigating these waters, and by no fault or neglect on the part of the master, but was one of those accidents which are called *"inevitable,"* and *"a casualty which no human prudence could foresee or provide against."* The principle of law, that the carrier in this case is responsible, unless the loss occurred by "the act of God," is not controverted. All the English cases, from *Coggs vs. Barnard,* to the present time, including that of *Forward vs. Pittard,* 1 *Term Rep.,* 27, decide this, and nothing more. The American authorities have followed these cases, and it is for this court to decide what accidents come within this term,

"act of God," and if the mischance in this case is one of them. The English decisions afford but little light as to the opinions of their courts on facts similar to those of the present case, but we have abundance of light from our own writers, and the courts of this country, and if the principles here laid down have somewhat relaxed the unbending rigidity of the English cases, it is submitted they are more consonant to the rules of equity and justice, better adapted to the spirit of our laws, and better calculated to promote the expanded wants and demands of our commercial marine. The case of *Smyrl vs. Niolon*, 2 *Bailey's Rep.*, 421, decides that a loss caused by the boat running on an unknown snag in the usual channel of the river, is referable to the act of God, and the carrier will be excused. This case was affirmed in the same State by that of *Faulkner, et al., vs. Wright, et al., Rice's Rep.*, 107, decided in 1838, where the boat was lost by running on a concealed and unknown snag. In this latter case Judge Richardson, though differing with the other judges in some of the principles of law, says: "The rule of law is plain; if the boat was unavoidably sunk, and the cargo thereby lost, the carrier is excused." The case of *Williams, et al., vs. Grant, et al.*, 1 *Conn. Rep.*, 487, comes up to the very case now before this court, and decides that "a common carrier is liable, under the general acceptance, for all losses, except such as are occasioned by the act of God, the act of the public enemies, or the act or default of the bailor himself. The term, 'act of God,' comprehends all misfortunes and accidents arising from inevitable necessity, which human prudence could not see or prevent. The striking of a vessel upon a rock not generally known, *and not actually known to the master*, is *prima facie* an act of God, for which the carrier is not responsible." This case was decided in 1816, and the whole of the English and American cases then determined were considered and reviewed, and the principles here laid down, are those still recognized in the State where the decision was made, and in many other, if not all the States of the Union. The cases of *Gordon, et al., vs. Buchanan, et al.*, 5 *Yerger*, 71, and *Turney vs. Wilson*, 7 *Yerger*, 340, referred to by the appellee,

decide the same principle, that the carrier is responsible for all losses not occasioned by the act of God, or the public enemies, but neither case defines what is meant by the act of God. Even the case of *McArthur vs. Sears*, 21 *Wend.*, 190, relied on by the appellee, is clearly within the same principle, that inevitable accident, without the intervention of man, excuses the carrier. In that case the boat was lost by pure human agency and human negligence, the act of God not being in the case at all; the loss was occasioned by want of the usual light from the light-house, which was *owing to neglect*, and the existence of a delusive light in the stranded vessel, which deceived the captain; both of these were human agencies, and not *the act of God*. The careful reading of that case will satisfy the court that no new principles were intended to be announced, nor the cases heretofore cited overruled, but that the judge who delivered the opinion of the court, agreed with the case of *Williams vs. Grant*, as to what accidents were to be considered as coming within the definition of "the act of God." See, also, 6 *Cowen*, 266, *Aymar vs. Astor*, and *Riley vs. Horne*, 5 *Bing.*, 217. The case of *Colt vs. McMechen*, 6 *Johns.*, 160, held that the failure of the wind excused the master from loss under circumstances much less strong than those of this case. So, also, *Elliott, et al., vs. Rossell, et al.*, 10 *Johns.*, 1, decided that "for all losses not arising from inevitable accidents, *or such as could not be foreseen or prevented*," the carrier was responsible. There the loss was occasioned by a rock not in the *regular channel*, and the *existence* of which was *known*, and the judge very properly held the carrier liable, but he also held that if the loss had arisen from extraordinary occurrences, such as winds, storms, &c., the carrier would have been brought within the exception.

These decisions are sufficient to show the enlightened views of the courts of this country on questions of loss similar to the present case. The elementary writers certainly sustain them. Chancellor Kent (3 *Kent*, 216,) lays down the rule, that carriers by water are liable as common carriers, in all the strictness and extent of the common law, unless the loss happens

by means of one of the excepted perils, and which he defines
to be such as do not happen by the intervention of man, nor
are to be prevented by human prudence; and he then men-
tions some of the excepted cases, one of which is a *rock* or
sand-bar.   *Story on Bailments, sec.* 489, defines what is meant
by "the act of God," to be "inevitable accident or casualty,"
and in *sec.* 492, he explains what casualty excuses the loss,
and, also, in *secs.* 513, 514.   In *sec.* 511, he refers to, and
approves of, the law as laid down in *Williams vs. Grant*, and
in *sec.* 516, the very case of loss by a sunken rock, not *generally
known*, is attributed to the *act of God*.   See, also, *Abbott on
Shipping, ch.* 4, *sec.* 6.   It is not denied but that the *onus* of
proof rests on the carrier to show that the loss was within the
excepted cases, under the expression, act of God, but if he
proves that the loss was occasioned by one of those occurrences
which are termed the acts of God, *prima facie* he discharges
himself, and the *onus* that the alleged cause or agency would
not have produced the loss without his negligence, is thrown
upon the plaintiff.   4 *Binney*, 127, *Bell vs. Reed, et al.*   2
*Watts*, 114, *Hart vs. Allen, et al.*   8 *Watts*, 479, *Reed vs.
Dick*.   3 *Mass.*, 481, *Putnam vs. Wood*.   And in *Williams
vs. Grant*, it is decided that the striking of a vessel upon a
rock not *generally known*, and *not actually known to the mas-
ter*, is *prima facie* an act of God, for which the carrier is not
responsible.   This is the present case, and the plaintiff has
entirely failed to remove the *onus* thus thrown on him, by pro-
ducing evidence of the carelessness, ignorance or omission of
duty on the part of the master.   The only case in this State
having any bearing on the principles of law discussed in this
cause, is that of *Boyle vs. McLaughlin*, 4 *H. & J.*, 291,
relied on by the appellee as deciding this cause.   A careful
examination of that case will show that the law, as there laid
down, applies very remotely to the facts of this, and can by
no means be considered as conclusive of it.   This is, in fact,
a new case in this State, and it is for the court now, for the
first time, to lay down the rules which shall hereafter govern
cases of this kind, as to the liabilities of carriers for losses
caused by inevitable accidents, and it is submitted that, in

coming to their decision, they will rather lean to the opinions of the courts of this country than those of England, even if it can be shown the latter would exclude this from the excepted cases of losses.

2nd. That the court erred in granting the instruction contained in the second exception. 1st. It was wrong, in point of law, upon the authorities and reasons already referred to in the first exception. By it the judge directs the jury to find for the plaintiff, unless they shall find "that the loss or damage resulted from the *direct* and *immediate* act of God, without the intervention of any human agency." It is believed that no authority in this country can be found laying down any such strict rule of liability, and it has already been shown by numerous authorities, and especially by the case of *Williams vs. Grant*, that loss *consequential* upon the act of God, may be such as will excuse the carrier. It is true, the sunken rock was the direct act of God, but that it was not the immediate and necessary cause of the accident, for it may have stood there a thousand years before any vessel was wrecked on it. The loss of the vessel was merely the *consequence* of running on it. 2nd. This instruction was calculated to mislead the jury. All the authorities agree, that to excuse the carrier, the loss must be ascribed to the act of God, but the cases already referred to, show how these words are understood as meaning "inevitable accidents," and "casualties which no human foresight could anticipate, or human prudence avoid." All these excepted cases were, by the stringent terms of this instruction, excluded from the consideration of the jury, and they were not only permitted, but directed, to apply those words, "direct and immediate act of God," in their most literal and narrow acceptation, and were deprived of all power to consider the loss occasioned by the striking of the vessel on a sunken rock, in the usual channel, and unknown to the master, as within the excepted cases, or excusing the carrier. And by this instruction, the jury were also excluded from all consideration of the conduct of the master, whose skill or care, negligence or omission of duty, it is their exclusive province to judge of. 10 *Johns.*, 1, *Elliott et al., vs. Rossell, et al.*   6 *Johns.*, 160, *Colt vs. McMechen.*

3rd. That the court erred in rejecting the appellants' second prayer, which is the ground of the third exception. This prayer is more specific in its terms, and brings the case more directly within the American cases already referred to, than the prayer first offered, and the ruling of the court upon it cannot be sustained, but by overruling or disregarding the whole current and effect of these decisions. The prayer embodies the very principles decided in *Williams vs. Grant*, as to the sunken rock, unknown to the captain and pilots, or persons carrying on navigation on the river, bringing the present case much more within the class of excepted cases to excuse the carrier, than the one there decided. But it is said, there was no evidence to support many of the conclusions to which the prayer assumes the jury may come. A careful examination of the evidence will, it is thought, satisfy the court of the contrary. Again, it is said this prayer should not have been granted, because the appellants prove the harbor was a *safe one*, and that by the *act of the captain* the vessel was forced upon a rock in the entrance of this harbor, where there was a buoy to direct him, and warn him of the danger. That the harbor was a safe one, is certainly a part of the appellants' case, because they could not be excused, if the captain, in seeking to enter an *unsafe harbor*, had sunk the vessel. But that the vessel, by the act of the captain, was forced upon the rock, they certainly deny, and the proof is, that he used every precaution, but did not know of the existence of the rock; and they insist that the running of the vessel upon it, was an inevitable accident, which he could not see, or provide against. In the case in 2 *Bailey's Rep.*, 421, it was shown that the passage of the river was safe, and just previous to the accident to the boat in that case, another vessel had passed in safety, the lost boat not following the channel, but being nearer the shore, when the accident occurred; but the court said the loss was occasioned by an accident which could not have been foreseen, and being referable to the act of God, the carrier was excused. The appellants also deny that there was a buoy to direct the master, and warn him of the danger. On the contrary, in avoiding the danger pointed out by the buoy, the

vessel was run on a hidden rock, which must be presumed (in the absence of proof to the contrary on the part of the plaintiff) to have been equally unknown to those who fixed the buoy, as to the master.

*Alex. B. Hagner* and *Alex. Randall* for the appellee:

1st. By the prayer contained in the first exception, the court was asked, in substance, to instruct the jury that if they found that the loss resulted from *inevitable accident*, they ought to find for the defendants. No such instruction has ever been given in any action against a common carrier, for injury to goods entrusted to his care. The law, as laid down in every decision and elementary work on bailments, is, that a common carrier is responsible for all accidents to goods entrusted to him for transportation, except such as arise from the act, 1st, of God; 2nd, of the public enemy; and 3rd, of the owner of the goods. The fault of the proposed instruction is, that under it, the jury were authorised to excuse the carrier, though there might be no evidence that the loss resulted from either of these causes. The books are full of cases in which the common carrier has been held responsible for losses from "inevitable accident." In 2 *Greenlf. on Ev.*, sec. 219, the position is thus stated: "It is ordinarily a good defence for a *private* carrier, that the loss was occasioned by *inevitable accident*, but a *common* carrier is responsible for all losses and damages, except those by the act of God, or by public enemies." It is competent for the court, in a proper case, to say that certain inevitable accidents, under the circumstances, should be considered as the act of God; or that the facts proved in the particular case, disclose a sufficient excuse for the carrier, under the law. But the proposed instruction is in neither of these forms, and is, in fact, an attempted repeal of the law, as it has been declared to be, ever since the time of *Henry VIII*. There may be inevitable accidents which could never be ascribed to the act of God, but are wholly attributable to human agency. It is true *some* inevitable accidents are said to be the result of the act of God, but it does not follow that *every* accident, which is inevitable, is of that character. Every loss

resulting from the act of God, is produced by an inevitable accident, but it is by no means true that every inevitable accident constitutes the act of God. The carrier is exonerated, not because the accident causing the loss is *inevitable*, but because this inevitable accident is of such a peculiar character as to be considered the act of God. Nor will it avail the appellants to argue, on this point, that the facts set forth in the exception prove that the loss was, in fact, the result of the act of God. The question for the court to decide is, whether the proposed instruction correctly stated the law on the subject? If it did not, the opinion of the court below will be affirmed. In the case of *Murphy vs. Staton*, 3 *Munf.*, 239, the court had granted an instruction exonerating the carrier for a loss on the upper James river, upon the ground that the navigation was attended with so much danger that the loss might have happened, notwithstanding the utmost endeavors to prevent it, and although the captain may have possessed competent skill, used due diligence, and provided hands of sufficient strength and experience. This was, in fact, an instruction like that under examination; but it was reversed on appeal, and the decision of the Court of Appeals adopted, in the subsequent case of *Friend vs. Woods*, 6 *Grattan*, 189. The proposed instruction also speaks of the accident as being one "which no human prudence could avoid." The case of *Smyrl vs. Niolon*, 2 *Bailey*, 423, cited by the other side, seems to determine the impropriety of this part of the instruction. The judge says: "In the case of the *Steamboat Co. vs. Bason*, *Harp.*, 262, an exception is introduced, as additional to the act of God, or the enemies of the country, *as where the loss could not be guarded against by human skill and prudence.* This, however, is improperly stated as constituting another case of exemption. If it is not *actus Dei*, it cannot excuse."

2nd. We will next consider the *third* exception. We first object to the form of the proposed instruction contained in this exception, upon the ground that it was calculated to mislead the jury, by assuming there was proof before them upon several points, as to which there was no proof whatever. 1st. There is no evidence "that there was nothing in the signs of the

weather, when the captain left Baltimore, *to threaten an inter-ruption of the voyage.*" All the witnesses agree that the morning was rainy and misty, and two of them prove that the whole day was foggy, and unfit for the vessel to leave port. Nor does any witness say that the fog *"sprung up suddenly,"* as is expressed in the prayer. 2nd. There is no evidence that "North point harbor was the harbor *most convenient* to be resorted to, under the circumstances." It is proved that Curtis' creek harbor was three or four miles nearer, and that the wind was fair to it. 3rd. The prayer speaks of a *sunken* rock. It was proved that, at low water, the witness, standing on the vessel, could see the rock under the water, which *rippled* over it, and it is also proved that it was low water when the vessel struck. The rock was not, therefore, *sunken*, that is, *hidden*, at the time of the accident. In *Johnson vs. Friar*, 4 *Yerger*, 50, much stress was laid on the fact that no *ripple* was visible on the river, and that, therefore, the snag was to be considered as *sunken*. But, in this case, the ripple of the water was per-ceptible from the vessel. 4th. There is not the slightest proof that "the *captain, or pilots,*" did not know of the position of the rock. 5th. The prayer authorises the jury to find that the captain "used every *precaution available to him* to harbor his vessel safely." There is no proof what precautions were pro-per to be used, or how far they were available to him. There was no proof to show why he could not have consulted the minute charts of these waters, published by the Government, or why he could not have shortened sail in such a fog, or why he could not have taken the proper side of the buoy, which plainly warned him of his danger. These would seem to be the usual and necessary precautions, under the circumstances, and were not adopted by the captain.

But we object, *secondly*, that the facts enumerated in the prayer, even if the jury had been justified in finding them, do not present a case excusing the carriers. This leads us to consider what is the legal interpretation of the phrase, "act of God," and whether the loss, in this case, should be attributed to that cause? It would seem, upon principle, to be a ques-tion of easy solution, for the phrase, by its very terms, excludes

the idea of *human* agency in producing the result.   In fact, all uncertainty as to its signification, is produced by confusing matters intrinsically distinct.   No one can doubt, for example, that if a sound ship is destroyed by lightning, the cause of its destruction is the act of God; and, on the other hand, if the destruction is produced by the pilot steering her upon a well known rock, that it is not attributable to that cause.   And yet it might be argued that the rock was placed there by the act of God, and that the accident occurred by his decree.   But this is confounding matters quite distinct, and has been well termed a mahometan extension of the phrase in question. The confusion arises from not distinguishing between *post hoc* and *propter hoc*.   It is condemned alike by the most ancient and most recent authorities.   "It were infinite," says Lord Bacon, in *Maxims of the Law, (Law Tracts,* 35,) "for the law to judge *the causes of causes,* and of their impulsions on one another, and, therefore, it contenteth itself with the *immediate* cause, and judgeth of acts by that, without looking to any further degree."   The true inquiry is, was the cause one "which could not happen by the intervention of man?" was it "produced immediately without the intervention of any human cause?"   1 *Term Rep.,* 27, *Forward vs. Pittard. Story on Bailments, sec.* 511.   "By the act of God, is meant a *natural necessity* which could not have been occasioned by the intervention of man, but proceeds from *physical* forces *alone,* such as violence of winds, lightning, or other natural accident."   2 *Greenlf. on Ev., sec.* 219.   In the note to *Coggs vs. Barnard,* 1 *Smith's Lead. Cases,* 43 *Law Lib.,* 180, 181, the phrase is thus defined: "The true notion of the exception is, those losses that are occasioned *exclusively by the violence of nature,* by that kind of force of the elements *which human ability could not have foreseen or prevented,* such as lightning, tornadoes," &c., "it certainly is restricted to the *act* of nature, and implies the entire exclusion of all human agency."   "The principle that all human agency is to be excluded from creating or entering into the cause of mischief, in order that it may be deemed the act of God, shuts out those causes where the natural object in question *is made a*

*cause of mischief solely by the act of the captain,* in bringing his vessel into that particular position *where alone* that natural object could cause mischief: in the cases in question, it was the act of the captain *that imparted to the natural objects* all the mischievous qualities that they possessed; for rocks, shores, currents, &c., are not, *by their own nature,* and *inherently,* agents of mischief, and causes of danger, as tempests, lightnings, &c., are; the danger, therefore, *sprang from human agency.*" This doctrine is quoted with approbation in *Fields vs. Woods,* 6 *Grattan,* 189, where it was held that tne act of God, which excuses the carrier, must be a *direct* and *violent* act of nature. In that case, a carrier stranded his boat upon a bar recently formed in the ordinary channel of the river, of the existence of which all in charge of the boat were ignorant, and yet he was held liable, because by *human foresight* and *diligence,* the existence of the bar might have been ascertained and avoided. The same doctrine is recognised in *McArthur vs. Sears,* 21 *Wend.,* 190, where the accident was caused by the pilot mistaking a light on a stranded steamer, which had been wrecked *by a tempest,* for one on the shore, of which wreck the captain knew nothing, and the night, too, was snowy and unusually dark, causing the mistaking of the lights, and yet the court held that "there was such an admixture of human means as vitiated the defence" that the loss was the result of the act of God.

The appellants' counsel refers to several cases which, he contends, establish a less stringent rule as to the liability of carriers. Before examining these cases, we call the court's attention to the fact that, in this case, no *"bill of lading"* was offered by the captain, which always contains an exception of "the perils of the sea," or some equivalent expression. That these words, "perils of the sea," are of much broader compass than the words, "act of God," is established by the following authorities: 12 *Georgia,* 578, *Brown, et al., vs. Clayton.* 43 *Law Lib.,* 180. 6 *Grattan,* 192, *Friend vs. Woods. Rice's Rep.,* 116, *Faulkner vs. Wright.* 4 *Yerger,* 50, *Johnson vs. Friar.* 5 *Yerger,* 81, *Gordon vs. Buchanan.* 21 *Wend.,* 198, *McArthur vs. Sears.* There is one case in which a contrary

Fergusson, *et al.*, *vs.* Brent.

opinion is announced, that of *Williams vs. Grant*, 1 *Conn.*, 487, though not by the court. One of the judges, who delivers a separate opinion, asserts that such is not the law, but he stands alone, against all the authorities. That this view is correct, appears from the consideration that, under the terms "perils of the sea," losses from the accidental collision of ships, and from the sinking of the ship from a hole eaten into it by rats, are excepted. Of course such losses could not be ascribed to the act of God, or the public enemy, and the carrier would be held liable but for the bill of lading. In every case cited by the counsel on the other side, there was a bill of lading containing an exception of "the dangers of the sea," or its equivalent expression, and the passages quoted by him from the elementary writers, are extracted from sections which are treating of "the perils of the sea." As this expression is an additional exception in favor of the carrier, which does not exist in the present case, those authorities cannot control the court here, even if the facts were similar. But even in cases where a bill of lading was received, the courts have held the carrier liable upon a much stronger state of facts in extenuation than those of this case. 21 *Wend.*, 190. 1 *Murphey*, 417, *Williams vs. Branson.* 8 *Watts & Sergt.*, 44, *Whitesides vs. Russell.* In 7 *Yerger*, 340, *Turney vs. Wilson*, it is said, that "the boatman is liable, as a common carrier, for all losses not occasioned by the act of God, or the public enemy, but certain events may be provided against in the contract, and then the carrier will not be liable for them." In that case, the exception of "the dangers of the river," in the bill of lading, was held to exempt the carrier from loss resulting from all hidden obstructions in the river, as rocks, logs, &c., which could not be foreseen, or avoided by human prudence, &c., thus showing that losses from such obstructions would not excuse him under the defence of the act of God. Yet, in that case, he was held liable, because he did not show that the loss resulted from some cause which human skill and foresight could not avert. In a case of a bill of lading, the exception of "the perils of the sea," only excuses such losses as arise "from *irresistible force*, or some overwhelming power

which cannot be guarded against by the ordinary exertion of human skill and prudence.'' *Story on Bailments, sec.* 512, *a.* It is impossible to deny that ordinary skill and prudence would have enabled the captain, in this case, to have avoided the rock. Other vessels had done so, and were safely moored in the creek, at the time; and if he had been acquainted with the channel, and skilled in his business, he could have entered it safely. Being ignorant of the navigation, his employers must pay the penalty. ''A loss directly and immediately occasioned by the *ignorance* or *inattention* of the master or mariners, is not deemed a loss by the perils of the sea.'' *Story on Bailments, secs.* 512, *a,* 518. The presence of a buoy, placed by the United States' officers in a frequented harbor, and appropriately marked, was the fullest notice, to an experienced captain, of the presence of danger, and no master would be allowed to defend himself from responsibility by pleading his ignorance of a buoy which was apparent to all trading near the place. If he was ignorant in spite of this information, his employers must suffer for it. ''If the situation of the rock is *generally known,* and the ship is not forced on it by tempests, &c., the loss is imputed to the fault of the master, whether it arises from not taking a pilot, or his own unskillfulness or ignorance.'' Though the rock may not have been known to the witness, Lacey, who was then, for aught that appears in the record, on his first voyage, nor to Captain Neale, twenty-five years before, still the placing of the buoy there had made it *universally* known. Suppose a light-house had been built upon it, and the captain, notwithstanding, had run against that, would the appellants be permitted to contend that the rock was not known to persons navigating the river? The buoy is to serve the same purpose. If he had lost the goods by running on the buoy, could he be excused upon pretense that its position was not known to persons navigating the river?

But apart from bills of lading, the cases cited on the other side are distinguishable from this. That in 2 *Bailey,* was decided on the ground that the frequent freshets and continual changes of the rivers of that State, constituted an exceptional

case, which could be guarded against by no human skill. The case of *Steamboat Co. vs. Bason,* places these cases upon the peculiar character of these rivers, and that such was the ground of the decision, is clear from the ruling of the same court, in *Ewart vs. Street,* 2 *Bailey,* 157, which sustains the strict rule of the common law, being a case not happening on a river of that State.    The case of *Williams vs. Grant,* is overruled by all the later cases, and in terms by *McArthur vs. Sears,* and with entire propriety.    The captain, in broad day, in fine weather, ran his vessel upon a rock so well known as to have received a particular name, and yet the court held him exempted, if the jury should believe he did not know of its existence.    The Supreme Court of the State did not condemn this instruction as unqualifiedly as they should, but as it appeared that the vessel was out of the usual channel, that the master was ignorant of the navigation, and had no pilot on board, they held the verdict for the defendant wrong, and awarded a new trial, upon the ground that though the situation of the rock was unknown, yet "it did not appear but that the running of the vessel upon the rock, might be attributed to the negligence of the captain."    They also held that the instruction was faulty, because it did not particularly call upon the jury to take into consideration the ignorance of the captain, the improper position of the vessel, &c.    Upon this ground, the present instruction was equally faulty, and was properly rejected.

3rd.   The appellants object to the instruction granted by the court in the second exception, because it was wrong in law, and on this point assert, that "loss *consequential* upon the act of God, may be such as will excuse the carrier."    We submit that such a doctrine is at variance with all the authorities.    In *Smith vs. Shepherd,* referred to in *Story on Bailments, sec.* 517, it was held, that the act of God, which would excuse the carrier, must be *immediate,* and *not remote.*   So in the case referred to in *sec.* 519, the frost, the act of God, cracked the boilers, and the goods were injured by the escape of the steam; but it was held, that the connection between the frost and the injury was too remote to exempt the carrier.    The case in 6

*Grattan,* 192, declares that the act of God, which excuses the carrier, must be *a direct and violent act of nature,* implying the *entire exclusion of all human agency.* Such is the language of the court in 2 *Bailey,* 157. See, also, 1 *Murphey,* 173, *Backhouse vs. Sneed,* and 43 *Law Lib.,* 180. The case of *Boyle vs. McLaughlin,* 4 *H. & J.,* 300, is full to the point. There the flour of the plaintiff was placed on a wharf by the carrier, and, while there, was damaged by a sudden rise in the creek, which, it was claimed, was the act of God. But the court held that the defendant should have removed the flour to a place of safety, that the loss was not occasioned *altogether* by the act of God, and, therefore, that the defendant was liable. "The carrier takes upon himself the knowledge and hazard of all the difficulties and perils of the route in which he proposes to go, except those proceeding *immediately and solely* from the act of God, or the enemies of the country," *(page* 302.) In that case the court instructed the jury that the defendants were chargeable, if they believe the loss was occasioned by the unskillful navigation of the vessel, or any other circumstance which could not be deemed the *immediate and distinct* act of God, or of the public enemy. That is the only reported case in Maryland upon the subject, and it is submitted that it contains the true exposition of the law, as in force in this State. In 1853, the subject was carefully considered in the case of *New Brunswick Steamboat Co. vs. Tiers, et al.,* 4 *Zabriskie,* 697. In that case, while the carrier's barge was moored at a wharf, a violent storm arose, which produced an unusually low tide, so that the barge was driven, by the wind, against a piece of timber which projected from the wharf, thirteen feet below the ordinary low water, the existence of which was unknown to the carrier, and this caused the loss. The court there say: "If divers causes concur in the loss, the act of God being one, but not the immediate or proximate cause, such act of God does not excuse the carrier; to have this effect, it must be one exclusive of human agency." The English law on the subject is set forth in the recent case of *Oakley, et al., vs. Portsmouth, &c., Steam Packet Co.,* 34 *Eng. Law & Eq. Rep.,* 530, which is very strong in our favor. In *Edwards on*

*Bailments*, the whole doctrine for which we contend is adopted, and the *5th Edition of Story on Bailments*, corrects the text of the former editions, wherever it tended to support the opposite theory. If the act of God combined with such act of man as could have been avoided, the carrier is liable. It may be true, the vessel would not have sunk but for the rock, but it is equally true, the rock would not have injured the vessel, if the captain had managed her properly. He set at naught every rule of prudence by his conduct in leaving harbor in foggy weather; in continuing under full sail in foggy weather; in neglecting to anchor near Fort Carroll, where, it is shown, he would have been safe; in having no chart of the river, or not consulting it, if he had; in not going into one of the nearer harbors, instead of this one, if he thought it necessary to leave the river; in not being careful to follow the direction of the buoy; and in almost every respect in which neglect could exhibit itself. Such is the case made by the record, and it seems irreconcilable with any other idea, except that he was resolved to reach the Potomac as soon as possible, to get another load of freight, and was determined to *run the risk* of accident, in putting out in the then state of the weather.

The appellants' counsel also contends that this instruction had a tendency to mislead the jury, but we cannot perceive the force of the objection. The whole case was submitted to the jury, who were bound to consider all the evidence. If the question of the skill of the master was not brought before them with sufficient prominence, the fault was in the defendants, who should have introduced evidence establishing his competency to navigate a vessel in those waters. On the other hand, it is clear the jury would have been misled, if the judge had not pointed out, with precision, the description of accident which is considered by the law as exempting the carrier.

Le Grand, C. J., delivered the opinion of this court.

This action was brought to recover damages for the injury which certain articles of property, belonging to the appellee, sustained, while on board the vessel of the appellants, on which they had been placed, for transportation from Baltimore

city to Charles county, in this State. The appellants were common carriers, and, as such, received the goods of the appellee for transportation. The plaintiff proved the shipment, the amount of damage, and that on the day the vessel left the port of Baltimore, the weather, in the opinion of his witnesses, who testified to its character, was such that the captain ought not to have sailed. The defendants gave evidence to show that the weather was misty at the time when the vessel sailed, and that, during the day, a heavy fog arose, which induced the captain to make for North Point harbor; that in this harbor there were many vessels; that in approaching it, he was at the helm, with a look-out, who, as the vessel neared the entrance, notified him there was a buoy, whereupon he bore away, and struck upon a sunken rock, about thirty yards from the buoy, and there sinking the vessel, which occasioned the damage complained of. There was evidence, by different witnesses, showing there were other harbors nearer to the vessel, when she was put in the direction of North Point harbor, than that one, and, also, that the sunken rock was unknown to persons who had navigated the Patapsco river; and, also, that at low mark, the ripple of the water would enable a person standing on the deck to discover its locality. This, in substance, was the evidence in the cause, and, on it, the defendants asked the instructions of the court in the manner detailed in their prayers, but the court refused so to instruct the jury.

Before adverting to the language of these prayers, and to the instructions given by the court, we shall, as plainly as we can, point out the liability which a common carrier is under, for, on its ascertainment depends the propriety of the action of the Circuit Court in the premises.

There is no evidence in the record of a bill of lading, and, therefore, the responsibility of the appellants depends upon the law as applicable to common carriers, strictly as such.

· There is a distinction in the law as applicable to *private* and *common* carriers. What we have to deal with in this case is, the law governing the liabilities of common carriers.

The cases in which this question has been considered, both

Fergusson, *et al.*, *vs.* Brent.

in this country and in England, are almost without number; the leading ones being very fully commented upon in subsequent cases, and by all the approved commentators on the law of shipping. And it is agreed, on all hands, that nothing will relieve the common carrier but an act of God, or the public enemies; or that which arises from some event expressly provided for in the charter-party. It is difficult exactly to define, in all cases, what is an act of God. "By the act of God, is meant a natural necessity, which could not have been occasioned by the intervention of man, but proceeds from physical causes alone; such as the violence of the winds or seas, lightning, or other natural accident;" per *Ld. Mansfield, in Forward vs. Pittard,* 1 *Term Rep.,* 27. 2 *Greenlf. on Ev., sec.* 219. This definition is about as accurate and specific as, perhaps, any that could be given. It excludes all circumstances produced by human agency, so that if divers causes concur in the loss, the act of God being one, but not the proximate cause, it does not discharge the carrier. To relieve him, the act of God must be the immediate cause of the loss, and without which it would not have occurred. This is the law (in the absence of a contract to the contrary) applicable to *common* carriers; *private* carriers will be discharged by proof of loss by *inevitable accident;* but with this distinction we have nothing to do in this case, because here the defendants were common, and not private, carriers; besides which, there is no special contract exempting them from the operation of the general doctrine, which is rigorous, to the greatest degree, in its exactions upon the carrier. We, as a judicial tribunal, have nothing to do with its policy; our duty is to enforce it. We are, however, fully satisfied it is founded in good sense, and approved by the concurring experience of maritime nations.

In the case before the court, the exemption from liability can only be claimed, from the evidence, on the following grounds: 1st. That it was prudent and proper the vessel should have retired to North Point harbor. 2nd. That, in entering the mouth of that harbor, all care and skill possible were employed, by the master and crew, to guard against injury. And 3rd. That the rock on which the vessel was

thrown, was concealed and unknown, so as to make the loss one occasioned by the act of God, or of inevitable accident. Unless these circumstances, if found by the jury, constitute a defence, then there was none. We have already said, that in the case of a *common* carrier, and in the absence of an agreement to the contrary, inevitable accident can have nothing to do with the case. The case of *Williams, et al., vs. Grant, et al.*, 1 *Conn.*, 487, if susceptible of the construction placed upon it by the counsel of the appellants, we have only to remark, that, with a single exception, the case in 2 *Bailey, S. C. Rep.*, 421, it is opposed to all others of authority. But we think it can be reconciled with them. In the case in 1 *Conn.*, the vessel, while on her passage, run against a rock, in Providence river, under a moderate breeze, in fair weather, and bilged, so that the salt on board was lost. The plaintiffs, the owners and shippers of the salt, proved the rock was well known, and that the vessel, when she run against it, was out of the usual course of navigation; and that there was no pilot on board, although it was usual to have one. The defendants, on their part, produced evidence to prove that the rock was not generally known. The court charged the jury, that if they should find, from the evidence, that the rock was generally known, the loss would be imputable to the negligence of the defendants, and they must return a verdict for the plaintiffs; but if they should find it was not generally known, then the loss was occasioned by a peril of the sea, and their verdict must be for the defendants. The jury found a verdict for the defendants, and a new trial, on the part of the plaintiffs, was moved for.

On the argument of this motion, which was granted, the court lay down—after asserting the broad doctrine to which we have referred, as governing this case—the principle controlling the one before them. Judge Swift, C. J., says: "If the rock on which the vessel was struck, *had been generally known*, then it was the duty of the master to *have known and avoided it*, and the loss would be imputable to his negligence. If the situation of the rock was not generally known, and the master did not actually know it, then, if he conducted properly in other respects, and no fault was imputable to him, his

Fergusson, *et al.*, *vs.* Brent.

striking on the rock would be an act of God, an unavoidable accident, and he would not be liable for the loss.'' Judge Gould says: ''It is very clear that a common carrier is liable, under a general acceptance, for all losses, except such as are occasioned by inevitable accident, the act of public enemies, or the act or default of the bailor himself.'' Again: ''By 'dangers of the sea,' are meant no other than *inevitable* perils, or accidents, upon that element; and, by *such* perils or accidents, common carriers are *prima facie* excused, whether there is any such express exception or not.'' This last quotation from his opinion, is in relation to the words, ''dangers of the sea,'' contained in the bill of lading.

It will be seen that both of the judges use the expression, *''inevitable accident,''* as synonymous with that of *''act of God.''* And, by affixing no other meaning to it, they assert no new principle, and, therefore, those opinions are to be read as though the words, ''act of God,'' had been used instead of those employed, to convey the same idea. It is true, that every ''act of God'' is an inevitable accident, because no human agency can resist it; but, because it is so, it does not, therefore, follow, in the sense of the books, that every inevitable accident is an act of God. Damage done by lightning is an inevitable accident, and also an act of God, but the collision of two vessels, in the dark, is an inevitable accident, but not an act of God, such as the stroke of lightning, nor is it so considered by the authorities. Whether Judge Gould be correct, or otherwise, in his definition of the words, ''perils of the seas,'' it is unimportant to inquire now, inasmuch as there is no bill cf lading in this case, containing these words. His interpretation of them, however, is in conflict with the opinions of others. See the very full and discriminating note on common carriers, by Hare and Wallace, to the case of *Coggs vs. Bernard,* 1 *Smith's Leading Cases, page* 268, *&c., edition of* 1852, and particularly the case of *McArthur & Hurlbert, vs. Sears,* 21 *Wend.,* 190. In *Gordon vs. Buchanan,* 5 *Yerger,* 72, 82, the act of God, it is said, ''means disasters with which the agency of man has nothing to do, such as lightning, tempests, and the like.'' ''The perils of the sea'' include some-

thing more; "many disasters which would not come within the definition of the act of God, would fall within the exception. Such, for instance, as losses occasioned by hidden obstructions in the river, newly placed there, and of a character that human skill and foresight could not have discovered and avoided." In the note referred to, will be found many cases wherein is clearly pointed out the difference between the words, "act of God," and "perils of the sea."

In the case before us, the undisputed evidence was, that a buoy pointed out the locality of the rock, and that at low mark it could be seen by the ripple of the water over its surface. It is also proved, by the defendants, that several vessels were safely moored in the harbor, at the time of the loss. The fact that a buoy was placed to indicate the dangerous spot, is, in our judgment, sufficient to establish that the existence of the rock was "generally known," and, in the language of Swift, C. J., in the case cited, "*it was the duty of the master to have known and avoided it.*" We can perceive of no more effectual mode of making proclamation of the course of channels, the location of bars, rocks, and other impediments to navigation, than buoys; they are the means employed by all commercial nations, for the protection of human life, and the safety of commerce.

Having thus stated the law as ruling this case, we apply it to the prayers of the defendant, and to the instruction given by the court to the jury. The first prayer was properly rejected. It excuses the defendants, if the jury should find the loss was occasioned by *inevitable accident,* without fault on the part of the carrier, and which no human prudence could have enabled him to avoid, which we have shown, in the case of a *common* carrier, is insufficient. If it is not *actus Dei,* it cannot excuse. The second prayer is also defective in several particulars, but one of which need to be stated, namely, it is unsustained by the evidence. There is no proof that the sunken rock was unknown to "pilots carrying on navigation upon the Patapsco river." Captain Neale speaks of a period twenty-five years previously to the accident, and, in fact, shows, by his cross-examination, that he knew but little of the

DECEMBER TERM, 1857. 35

navigation of the river. As to the hands on board, their testimony shows they knew nothing of the other and more convenient harbors; but, above all, the buoy gave, or ought to have given, knowledge of the rock to the master, and he should have avoided it. We think the court gave the proper instruction, which, upon the jury finding the necessary facts, excused the defendants, only, if the jury should further find "the loss or damage resulted from the direct and immediate act of God, without the intervention of any human agency."

