————o————

No. 3597.

(Court of Appeal, Parish of Orleans.)

LEHMAN, STERN & CO., LTD., vs. MORGAN'S L. & T. R. R. & S. S. CO.

Appeal from Civil District Court, Division "D."

Solomon Wolff, for Plaintiff and Appellant.

Victor Leovy, for Defendant and Appellee.

Moore, J., dissents and writes separate opinion.

1. In Hunt vs. Morris, 6 M. (O. S.) 676, it was held that in cases of loss which are not supposed to happen without negligence, the carrier is bound to show, that they happened without fault or negligence on his part, which, being a negative proposition, can only be established by evidence of the ordinary care and attention usually given by diligent men on like occasions.

2. In Brousseau vs. Ship Hudson, 11 An. 428, without mention made of Hunt vs. Morris, it was held that, where the common carrier is unable to make good defence upon some of the grounds which form exceptions to his liability, it is clear he must pay the loss, although not chargeable with any negligence whatever, and, in fact, even where he has exercised every possible diligence to prevent the loss.

3. In Maxwell Putnam vs. R. R. Co., 48 An. 385, the Court does not refer to Brousseau vs. Ship Hudson, but, in defining the responsibility of carriers in this State, approvingly cites Hunt vs. Morris, and holds that the responsibility of a carrier must be considered as that of a bailee for hire answerable for ordinary neglect.

236

4. This is the last utterance of the Supreme Court, of which we have knowledge, on this subject, and we shall follow it.

DUFOUR, J. The plaintiff claims damages for certain cotton destroyed by fire which was transported hither from Shreveport by the defendant and which was in course of delivery when the accident occurred.

It is conceded that the amount claimed, correctly represented the loss, but liability is denied on the ground that the railroad company used due diligence in protecting the cotton, and is therefore not responsible for the loss.

The law of the case is to found in Arts. 2751 and 2754 R. C. C., which reads as follows:

"Carriers and watermen are liable for the loss or damage of the things entrusted to their care, unless they prove that such loss or damage has been occasioned by accidental or uncontrollable events," 2754 "carriers and watermen are subject, with respects to the safe keeping and preservation of the things intrusted to them, to the same obligations and duties which are imposed on tavern keepers in the title of Deposit and Sequestration." 2751.

The question now tendered is whether the carrier must show, under the jurisprudence, exactly how the damage occurred and specifically trace it to some particular accident or uncontrollable event, or whether he is exonerated by proof of due diligence on his part.

In support of the former view, the plaintiff cites a decision which undoubtedly sustains his contention:

"Where the common carrier is unable to make good his defence upon some of the grounds which form exceptions to the liability, it is clear he must pay the loss, although not chargeable with any negligence whatsoever, and in fact even where he has exercised every possible diligence to prevent the loss."

The court then goes on to say that the words *"eas fortuit"* and "force majeuro" are used in the civil law in the same sense that

the words "act of God" are used at the common law, and in support of the doctrine just quoted, cites Story on Bailments, Angell on Carriers, Kent's Commentaries, and a decision of the Supreme Court of Delaware.

Brousseau vs. Ship Hudson, 11 An. 428.

That decision would appear to hold that under the very text of our Code, a carrier is an insurer as at that common law, and it does not refer to Hunt vs. Morris, 6 Martin (O. S.) 676, in which the Court used the following language:

"The rule by which the responsibility of carriers for loss or damage is to be ascertained, is found in the part of the Code just cited (R. C. C. 2754). They are excused by accident, or overpowering force, *eas fortuit on force majeure,* whereever the first does not occur by their negligence, and they do not unnecessarily go in the way of the latter; in other words, if they have used that due diligence in the performance of the contract, which the nature of their situation requires.

It appear by the expression of the Code, that the accident or overpowering force must be proven by the carrier, in order to excuse his failure to perform his undertaking, according to agreement. In the cases, where the loss or damage arises from occurrences entirely beyond the control of the carrier, such as an attack by the public enemy, a storm or tempest, it is enough for him to prove the fact, and he who claims compensation for the loss is to prove the fault or misconduct of the carrier, in order to recover against him.

"But in those cases, which are not readily supposed to happen without negligence, such as a loss by fire, robbery, etc., the corrier is bound to show, that they happened without and fault or negligence on his part, which, being a negative proposition, can only be established by evidence of the ordinary care and attention, usually given by diligent men on like occasions. This rules gives to the plaintiff the advantage of implied or presumptive evidence of negligence, on the part of the masters and owners, which they

are bound to disprove by showing due diligence."

We do not find that Ship Hudson has ever been, either directly, affirmed or overruled in any subsequent case.

In 14 An. 430, it was said that "the goods are delivered into the possession of the carrier, and it is for him to show that he used due care." In 15th An. 103, though it is stated that injury being proved, the burden of proof was on the carrier to show that the injury was caused by accident or *vis major,* the decision appears to have been rested on proof of carelessness or unskillfulness of the crew, in 18 An. 107, the carrier was made to carry the burden of proof that he had used exact diligence in the preservation of the goods, in 20 An. 302, the common carrier was held bound for ordinary negligence, in 23rd An. the defendant proved that the accident was not owing to any fault of theirs.

In Darrell vs. S. P. Co., 47 An. 1455, it was said that our code does not impose upon carriers the responsibility incident to the relation under the common law."

In Maxwell & Putnam vs. R. R. Co., 48 An. 385, the Court referred to Arts. 2751, 2754, 2967, 2937, 2938 as defining the responsibility of carriers in this State and reviewed some of the cases on the subject.

No reference is made to Brousseau vs. Ship Hudson *supra,* but Hunt vs. Morris is approvingly cited as holding that the responsibility of the carrier must be considered as that of a bailee for hire answerable for ordinary neglect.

This is the last utterance of the Supreme Court, of which we have any knowledge, on this subject, and we shall follow it.

It is said that the language referred to is *obiter,* the decision in that case having been rested on the proof that the railroad company had been negligent.

It is sufficient answer to say, that the Court deliberately undertook to define the responsibility of carriers, and to apply the principles it announced to the facts presented.

On the facts of the case the District Judge said:

239

"The presumptive negligence on the part of defendant has been destroyed by the positive evidence given by it that ordinary care and attention usually given by diligent men on like occasions were exercised by it on this occasion. The cotton was placed in the usual safe place for freight, it was covered by tarpaulins and a watchman was placed in charge over it. The cotton could not have been ignited by sparks from passing locomotives belonging to defendant, for none passed the cotton, except those which were equipped with spark arresters, and no one except employee's of plaintiff and defendant were near or had been near the cotton when the fire occurred."

We find no error in his conclusions of law and of fact, and his consequent exoneration of the defendant from liability. Judgment affirmed.

February 20, 1905.

Writ granted by Supreme Court.

Reversed by Supreme Court.

## DISSENTING OPINION.

1. The responsibility of the Common Carrier for loss or damage of the thing intrusted to him for carriage, is the same under the Civil Law as it is at Common Law.

2. The term "Cas Fortuit" is, in law, synonymous with the expression "an act of God."

MOORE, J. I am of opinion that the responsibility of a common carrier for loss of, or damage to, the thing intrusted to him for carriage is the same under the civil law as it is at common law.

At common law the only causes which will excuse the carrier for a non-performance of his contract must be events falling within the meaning of the expression "act of God or the public enemy."

The earliest use of the term "Act of God" that can be found in the English reports, is by Sir Edward Coke, 1 Co. 976, in

240

1581, in Shelly's case, speaking of the death of a man, and he uses it subsequently (5 Co. 87 a. 1 Ins. 206 a.), also meaning death; and again, (10 Co. 1396) where it is applied to a sudden tempest breaking down sea walls, and refers to the statute where the term is "inevitable dangers or necessity." Moreover, Coke used the phrase, "the act of God excuses," as equivalent to *Impotentia excusat legem* (Coke Litt., 29), and also equivalent to an accident which is so "inevitable that by no providence or industry of him who is bound it can be prevented," or, as in Shelly's case, "which no industry could avoid nor policy prevent." Again he uses the phrase as applicable to a sudden storm (1 Bulst. 280, i Roll Dep. 79).

Subsequently, Lord Mansfield, in Forward vs. Pittard (1 Term, R. 27), introduced a somewhat different view, holding that to be an act of God it must be such a one as could not happen by the intervention of man, as storms, lightning and tempests, (Hays vs. Kennedy, 41 Pa. 378; 80 Am. Dic. 627), and this expressed in varying phraseology, is the accepted definition of that expression. This same expression: "The act of God," however, is employed by Gaius: $\theta\varepsilon\tilde{o}\upsilon\ \beta\iota\alpha\int$ (Theu Bian) as comprehending the Roman terms, *fataliter divinitus, casus fortuitus, damnum fatale,* all of which terms originally referred to the intervention of the gods, in the sense that human agency was powerless; and it was from this source, and with the intention of conveying the same idea as is conveyed by the Roman terms, that, I believe, the expression "the act of God" was first introduced into the common law. And so also am I of opinion that the rule, as well as the reason and the policy of the rule, which imposes upon the common carrier a strict and peculiar obligation and which treats him as an insurer against all but the "expected perils," which Sir William Jones called the "sinew of wisdom," was borrowed from the Roman law. Two notions have been entertained with regard to the source of this rule; one that it was borrowed from the Roman law, the other that it was introduced by custom

241

as an exception to the general law of bailment in the reigns of Elizabeth and James I; but so far as I have been able to ascertain, the only authority holding the latter view is Nugent vs. Smith, L. R. Com. Pl. Div., Vol. 1, p. 426, decided in 1876 by Cockburn, L. C. J., whereas the great weight of authority, including in the number such authors, scholars and jurists as Sir William Jones, and Saville and Dyer and Brett and Denman and Sohm and our own Chancellor Kent and Justice Story, hold the former view.

Originally carriers for hire by the Roman law were not put under any peculiar obligations which did not belong to other bailees for hire, except in the case·of a *fullo*; but it appears, however, that, as said by Ulpian, (Dig. Lib. 4 tit. 9. 1. 1., Par. 1) as an extraordinary confidence is necessarily reposed in shipmasters, inn-keepers and stable-keepers, to whom the custody.of things is committed; a severer rule than that applying ordinarily to bailees, was necessary so as to thus prevent this particular class of persons from "combining with thieves against those who trusted them," a special edict was passed by the Practor, by which shipmasters, inn-keepers and stable-keepers were put under a peculiar responsibility and were made liable for all losses not arising from inevitable casualties or overwhelming force. *Ait Praetor; Nautae, caupones stabularii quod cusjuque salvum fore receperint, nisi restituent in eos judicium dabo.* (Dig. Lib. 4, tit. 9. 1. 1. 5; Story on Bls., par. 458.)

The.construction put upon this edict was that bailees were liable in every case of loss or damage, although happening without any fault on their part, unless it happened by what was called a "fatal damage."

"By this edict," says Ulpian, "the one who takes the goods is liable under any circumstances, *even if the thing perish or is damaged without his fault,* unless the accident happen from a *damnum fatale."* Then Laber writes, if anything shall have perished through shipwreck or by the force of pirates an equitable exception should be made in favor of him. Likewise it will be held it

a *vis major* shall have overtaken the shipmaster, inn-keeper or stable-keeper. At hoc Edito omni modo, qui recepit tenetur, etiamsi sine culpa ejus res periit, vel damnum datum est; nisi si quid damno fatali contiugit. Inde Labeo scribit si quid naufragio, aut per vim piratarum perierit, non esse iniquum exceptionem ei dare. Idem erit dicendum, et si in stabo, aut iu caupona vis major contingerit. (Dig. Lib. 4 tit. 9. 1. 3., par. 1.)

It seems clear that it was the purpose of this edict to impose upon the class of persons named therein the same extraordinary responsibility which the law imposed on a fuller, which was so great that if the clothes received by the latter to be cleaned by him were stolen the owner might not even have his action against the thief, because, as runs the law, *the owner is not considered as interested in their safety,* having a right of action called *locati* against the fuller. Item si Fullo polienda curandave, aut sarcinatur sarcienda, vestimenta mercede certa constituta acceperit, eaque furto amiserit, ipse furti habet actionem, non dominus; quia domini nihil interest, eam rem non perire; cum judicio locati a fullone, aut sarcinatore, rem suam persequi possit. (Ins. Jus. Liv. IV, Tit. 1, Par. XV.)

From the edict of the Praetor, says Kent, the principle of extraordinary responsibility of the common carrier and which regards him in the nature of an insurer, was taken; adding, that this principle "has insinuated itself into the jurisprudence of the civilized nations of Europe." (Kent's Com., Vol. II, p. 597.)

Referring to this same edict, Story says: "The modern nations of Continental Europe seem to have incorporated the same general obligations into their jurisprudence, with the exceptions of like nature. The Roman edict, it will be at once perceived, did not extend in terms to carriage on land. But in most, if not all modern countries, the rule which is presented has been practically expounded to include them." (Story on Bail, par. 458.)

To this same source may be traced Art. 1784 of the Code Napoleon, which article did not exist in the "projet de code" sub-

mitted to the Court of Appeal. The Court of Lyons having said (Fenet 1. 4. p. 210), "Le Code omet de declarer les voituriers responsables de la perte et des avaries des merchandise a moins qu'il ne prouvent la force majeure," the Council of State thereupon introduced into the text this article. (Trolong' Du Contrat de Louage, Chap. III, Vol. 2, Par. 926.) This article, which is reproduced in our Code as Article 2754, reads: "Les voituriers sont responsables en outre de la perte et des avaries des choses qui leur sont confiées, a moins qu'ils ne prouvent qu'elles ont été perdues ou avariees par cas fortuit ou force majeure."

These expressions, *cas fortuit*, and *force majeure*, are derived from the Roman terms *"casus fortuitus"* and *"vis major,"* and have precisely the same meaning. The former is synonymous with *"fatalitier divinitus"* and *"damnum fatale"* and all with the expression, "the act of God." The latter, *"force majeure,"* being either, but not necessarily, "the act of God," or, such an interposition of human agency, as is from its nature and power absolutely uncontrollable. Of this nature are losses occasioned by the inroads of a hostile army, or as the common law phrase is, by the "King's enemies," that is, by public enemies. I think 1 may safely rely on the authorities here following for the assertion that all these phrases have the same meaning in the Roman, the French and the Common Law, viz:

Kent's Com., Vol. III, P. 216 (5) : "A casus fortuitue was defined by the civil law to be quod damno fatali contingit, cuivis diligentissimo possit contingere. It is a loss happening in spite of all human efforts and sagacity."

In Straccha, Glossa 22, casus fortuitus is defined to be accidents, quod per custodiam, curam et diligentiam mentus humanae evitare non protest. Sauterna, de Ars, part 3 N. 65, adds, ubi diligentissimus praecavisset et providessat non dicitur proprie casus fortuitus. Ibid, Note C., p. 300 (4).

Vinnius, Part Juris. Lib. II C. 66, gives the following definition: Casum fortuitum definimus omne quod humano, coeptu

**praevidere** non protest, nec cui proviso protest resisti. (Fortuitous events we define to be everything which man (*humano*) cannot foresee, nor human efforts resist.) He enumerates various instances: "Casus fortuiti varii sunt: veluti a vi ventorum, turbinum, pluviarum, grandinum, fulminum, aestus, frigoris, et similum calamutatum quae coelitus immittuntur. *Nostri vim divina dixerit. Graci:* Θεοῦ βιαν̄"

Baldus, Quaest 12 No. 4, gives the following definition: "Casus fortuitus est accidens, quod per custodiae curam, vel diligentiam mentis humanae non protest evitavi ab eo qui patitur."

Averani, cited in Nugent vs. Smith, supra, says: "Casus fortuitus appellatur vis major, vis divina: fatum damnum fatali, fatalitas."

Facciolatus & Forcellinus in their "Totius latinatis lexicon," *verbo*, "Vis," say: "Praeterea vis dicitur violentia et calamitas quae de coelo venit. Ea quoque duplex est, major et minor. * * * Ante omnia autem duo genera esse coelestis injuriae meminesse debemus. Unum quod tempestates vocamus: in quibus grandines, procellae, ceteraque similia intelliguntur, quae cum acciderint, vis major appellatur. Haece ab horridis sideribus exeunt, veluti, Arcturo, Orione, Haedis. Alia sunt illa quae silente coelo, serenisque noctis, fiunt, nullo sentients, nisi cum facta sunt. Publica haec, est magnae differentiae a prioribus, aliis rubiginem, aliis uredinem, aliis carbunculum appelantibus, omnibus vero sterilitatem. * * * Sed latius patet, et ad alia quoque vis haec caelestis refertur, incendia nempe, terrae motus, aut labes ingentis, vim aquaram, morborum, pestilentiae; et dicitur etiam a Gaius, vis *magna, divina, naturalis* et cui resisti non protest. Θεοῦ βιαν̄ (Moreover, *vis* is said to be a violence and calamity which comes from the heavens; it is also duplex, major and minor. We ought to remember especially that there are two-thirds of heavenly injury, one called tempests, in which are included hail-storms, rainstorms and other like things, which, when they happen, are called vis major. There are other things which happen when the

245

sky is serene and in the silence of the night, when no one perceives them until they are done. These are public calamities and are completely different from the former. But it stands even further, and this heavenly power refers to other things also, as. for instance, fires, earthquakes, force of waters, of diseases, of plagues and indeed as is called by Gaius "A divine natural power which cannot be resisted: $\Theta \varepsilon \tilde{o} v \ \beta \iota a \mathcal{J}$

Ibid: verbo, "Casus": "Casus fortuitus is called those things which happen without the aid of man, such as storms, fires, bites of animals and such things. Casui fortuiti vero ea assignentur, quae sine ulla hominum ope eveniant, ut procellae, incendia, morsus, bestiarum, et similia."

Ibid, verbo "Fatum": "Fate, destiny, a series of causes, the causes, the course of nature, the appointment or determination of the· Deity, the will of heaven."

It will be noticed that fire is included in casus fortuitus by the Romans, but it is quite evident that they referred to fire caused by the heavenly forces, (an act of the Deity), when we reflect that fire was not only regarded by the Romans as a divine agency but was looked upon by them as a divinity itself. Vesta had no image or statue in her own temple at Rome; the vestal fire being considered as the very goddess herself; and, as Ovid relates, the husbandmen who ate their repast before the· hearth, believed. that they sat in the presence of the gods themselves. Even in the scriptures, fire seems to be an agency of the Divinity. God, it is said, often appeared in or encompassed with fire, as to Moses in the burning bush on Mount Sinai; and to the prophets Isaiah, Ezekiel and St. John. The wrath of God is described by a consuming fire, and the angels, as His ministers, are compared to it.

Targo, cited by Emerigon, p. 247, Chap. XII, Sec. VIII, says that a vessel taking fire is not an accident presumed fatal, but that it is to be attributed to a fault of some one whenever it is not known how it happened.

Sweet's Law Dictionary, Verbo: "Vis Major": "Vis Major is practically equivalent to the act of God."

Emerigon, Chap. XII, p. 285: "Accidents, casus fortuitus, are those events which no human prudence could forsee. Fortuitus casus nullum humanum concilium providere potest (L 2 par. 7 ff de admin res ad vivit L 6 de Pignor act.) Superior force, vis major, is that which cannot be resisted; Cui resisti non potest. The two commingle. By accidents, cas fortuit, is meant a superior force which cannot be foreseen nor resisted. Fortuitus casus est cui non potest resisti, et cui praecaveri non potest; (cujus ad code de locate casa regis disc. 23 N. 38 Strogi 22). There is a difference between a fortuitus case and a case unforeseen. The loss that happens through the imprudence or unskillfulness of the Captain is unforeseen, but it is not fortuitous. Improvisus casus dicitur qui solet imprudentibus contingere. *In a word, we place in the category of fortuitous cases only those which happen in spite of all human prudence.* Quod facto contingent, et cuivis patri familias quamvis diligentissimo, possit contingeret. L. 14 par. 5 ff de minorib."

Baudry-Lacantinerie, Précis de Droit Civil II, 891: "D'une force majeure ou d'un cas fortuit. Ces deux expressions, qui, dans le language de la loi, paraissent être le plus souvent synonymes, désignent tout événement qu'on ne saurait resister quand même il serait prévu, come le feu du ciel, un tremblement de terre, la grêle, la maladie, la mort, la guerre."

Merlin, Repertoire de Juris, Vol. 3, Par. VII, Des cas fortuits: "1. On donne ce nom a des évènements occasionés par une force majeure qu'on ne peut pas prevoir, et a laquelle on ne peut pas resister. Tels sont les debordements, les naufrages les incendies, le tonnere, etc."

Ibid III: "Le cas fortuit comprend toutes les pertes qui arrivent par tempete, naufrages, échouement, jet, feu, prise, pillage, etc. Repertoires du Journal du Pal., 1891 to 1890, p. 801, par.

3, citing Cass. 7 Aout 1870 (Lefebore), 8. 91. 1. 238, p. 91. 1.
558: La force majeure ne peut résulter que un évènement inde-
pendent de la volonté humaine, que cette violonté n'a puni prévoir
ni conjurer."

Boucher, Institution au droit maritime, par. 54, Cas fortuits et
de force majeure: "On appelle cas fortuits les evenements que la
prudence humaine ne sauvait prévoir. On appelle force majeure,
cella à laquelle on ne peut resister. Ces deux points se con-
fondent souvent ensemble. Par example, si après avoir loué un
navire, le gouvernement le requiest pour le service de l'état, dans
cette circonstance il y a cas fortuit et force majeure. Mais si le
feu du ciel brule mon batîment, il n'y a, à proprement parler, que
cas fortuit. Comme aussi si jenvoie mon bâtiment aux colonies,
lorsque je sais que la mer est couverte de corsaires enemis, pré-
voyant qu'll peut être pris, s'il est captivé par un corsaire
beaucoup plus fort que lui, il n'y a proprement parler que force
majeure."

Dic. de Jursp., verbo, Cas Fortuit: "An unforeseen event
which cannot be prevented. Lois de Bat. pt. 2. c 2. That which
neither of the parties has occasioned or could prevent."

Dic. Gen'l de Droit Civil par une société de jurisconsultes.
Verbo, Cas Fortuit: "On appelle cas fortuits les événements qui
sont indépendants de la volonté de celui à qui ils arrivent soit
quils lui cau sent de gains ou de pertes. Les cas fortuits propre-
ment dits s'entendent des événements qui n'ont d'autres causes
que le hazard, ou plutot des décrêts inconnus de la providence,
tels que les incendies causés par le feu du ciel, les débordements
de rivières, leur changement de lit, les alluvions, la recontre d'une
bête égarée, une maladie ou une mort imprévue, les orages, la
stérilité, les tremblements de terre, la plupart des maladies con-
tagieuses, les actions des fous et des enfants qui n'ont pas atteint
l'age de discernement. Quelques auteurs comprennent sous le
nom de cas fortuit, ce qui est causé par force majeure, par ex-
ample l'effet d'une loi nouvelle, tel que la defense d'exporter des

248

blés, les faits du prince, les invasions de l'ennemi et les ravages de la guerre."

Ibid: Verbo, Force Majeure: "Force Majeure est toute force a l'aquelle on ne peut résister, soit de fait, soit de droit."

These authorities, in my opinion, seem conclusive of the fact that what is called the common law rule as to the responsibility of common carriers was borrowed from the civil law; and that the terms *casus fatalitis,* and *vis major,* or as expressed in the Civil Code, a "fortuitous event" and a "superior force," are synonymous with the common law expression, "the act of God" and the "public enemy." Indeed, it is not necessary to look further than to our own code for the definition of these phrases, nor to other authorities than our own Supreme Court for the affirmance of the assertion that the terms "cas fortuit" and "force majeure," are synonymous with the common law expression, "the act of God," etc.

Art. 3556, No. 15, declares that a "fortuitous event is that which happens by a cause which we cannot resist;" and

*Ibid,* No. 14, says that "Those accidents are said to be caused by superior force, which human prudence can neither foresee nor prevent;" which are, practically, the same definitions which the authorities, *supra,* give to the terms "casus fortuitus," "damnum fatale" and "vis major," etc.

In A. Brousseau vs. Ship Hudson, et als., 11 A. 427, an unanimous court held that, "Under our code, common carriers are liable for the loss or damage of the things intrusted to their care, unless it be shown by them that such loss or damage was occa- force majeure). The terms, vis majeure (superior force) is used in the civil law in the same way that the words "Act of God" are used in the common law, and so also is the term casus fortuitus. By the act of God is meant inevitable accident or casualty." This case is cited and relied on in the case of

Cromwell vs. Ship Fosdick, 15 A. 436; and in Pitre vs. Offut, et al., 21 A. 679.

In Engester & Co. vs. West & Co., 35 A. 119, the same construction was put on the phrase 'cas fortuit" and it was held that "in its legal sense "fortuitus event" is synonymous with "act of God" in the common law, and the Pandietes Francaise and Emerigon are cited and relied on as authorities therefor.

These are the only cases which I can find in our reports where the question as to whether the terms "cas fortuit" is synonymus with the term "an act of God" was absolutely necessary to a decision in the cases, and where it was squarely met by the Court and received direct decision. These cases have never been overruled. Maxwell & Putnam vs. R. R. Co., 48 A. 386, does not do so. This case, which is relied on by the Court and is made the basis for its decision in the instant cause, does not, in the first place, deal with this question at all. The case did not present the inquiry whether the carrier's responsibility was to be measured by any rule of the civil law supposed to be different from the rule of the common law. No question as to whether he was to be regarded, under our law, as an insurer, or not, was present in that case; nor did the plaintiff's seek to hold the carrier liable on any other ground than that the loss was occasioned by the carrier's *fault* without regard to how the accident which occasioned the loss may have occurred. The defense set up by the carrier was that the loss was occasioned by fire and that fire was specially excepted in the bill of lading as one of the dangers for which the carrier was not to be responsible. In the next place, the court found that the carrier, notwithstanding the exception in the bill of lading, was responsible for the loss because had it not been for the lack of due care and watchfulness, on his part, the loss would not have occurred; hence if the court did in that case express any views contrary to the views held in the two cases cited, *supra,* it was simply *obiter,* and I do not think that I may not disregard it

and be at liberty to follow the doctrine taught in Brousseau's case (11 A. 427), and in Engester's case (35 A. 119), *supra*.

I say that any expression of views in Maxwell's case on the subject here discussed is *obiter*, for as much as the rule both at common law and in the civil law, is precisely the same as to the responsibility of the carrier when the proximate cause of the accident, whatever it may be, and which occasioned the loss or damage, would not have happened had it not been for the remote fault of the carrier. The court having found the carrier to be at fault, the question here discussed could not possibly be in that case.

For these reasons I respectfully dissent from the opinion and decree herein.